**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| AMR CORPORATION, *et al.*, | Case No. 11-15463 (SHL) |
| | |
|                       Debtors. | (Jointly Administered) |

------------------------------------------------------------------------x

U.S. BANK TRUST NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Trustee and Security
Agent under the Indenture and Aircraft Security
Agreement for the American Airlines 2009-2 Senior
Secured Notes Due 2016,

                      Plaintiff,

               v.                                     Adv. Pro. No. 12-01932 (SHL)

AMERICAN AIRLINES, INC.,

                      Defendant.

------------------------------------------------------------------------x

U.S. BANK TRUST NATIONAL ASSOCIATION, not in
its individual capacity, but solely as Loan Trustee under
Indenture and Security Agreement with respect to the
AMR 2009-1 EETC transaction and AMR 2011-2 EETC
transaction,

                      Plaintiff,

               v.                                     Adv. Pro. No. 12-01946 (SHL)

AMERICAN AIRLINES, INC.,

                      Defendant.

------------------------------------------------------------------------x

## <u>MEMORANDUM OF DECISION</u>

A P P E A R A N C E S :

DEBEVOISE & PLIMPTON LLP
*Special Aircraft Attorneys for the Debtors and Debtors in Possession*
919 Third Avenue
New York, New York 10022
By:    Michael E. Wiles, Esq.
          Richard F. Hahn, Esq.
          Jasmine Ball, Esq.


WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors and Debtors in Possession*
767 Fifth Ave.
New York, NY 10153
By:    Harvey R. Miller, Esq.
          Stephen Karotkin, Esq.
          Alfredo R. Pérez, Esq.


CHAPMAN AND CUTLER LLP
*Attorneys for U.S. Bank Trust National Association, as Loan
Trustee for 2009-1 EETC and 2011-2 EETC Transactions*
111 West Monroe Street
Chicago, Illinois 60603
By:    James E. Spiotto, Esq.
          Ann E. Acker, Esq.
          Franklin H. Top III, Esq.

-and-

330 Madison Avenue, 34th Floor
New York, New York 10017-5010
By:    Craig M. Price, Esq.
          Laura E. Appleby, Esq.


SHIPMAN AND GOODWIN LLP
*Attorneys for U.S. Bank Trust National Association, as Loan
Trustee for 2009-1 EETC and 2011-2 EETC Transactions*
One Constitution Plaza
Hartford, Connecticut 06103
By:    Ira H. Goldman, Esq.
          Corrine L. Burnick, Esq.

SIDLEY AUSTIN LLP
*Attorneys for U.S. Bank Trust National Association, as Trustee and*
*Security Agent for the American Airlines, Inc. 2009-2 Secured Notes Due 2016*
787 Seventh Avenue
New York, New York 10019
By:    Michael G. Burke, Esq.
       Nicholas K. Lagemann, Esq.
       Noam M. Besdin, Esq.


SHIPMAN AND GOODWIN LLP
*Attorneys for U.S. Bank Trust National Association, as Trustee and*
*Security Agent for the American Airlines, Inc. 2009-2 Secured Notes Due 2016*
One Constitution Plaza
Hartford, Connecticut 06103
By:    Ira H. Goldman, Esq.
       Kathleen M. LaManna, Esq.
       Corrine L. Burnick, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion (the "Motion") of the above-captioned debtors and

debtors-in-possession (collectively, the "Debtors") for authority to enter into a postpetition

secured financing transaction and for authority to use cash on hand, including the proceeds of the

new financing, to repay the obligations of American Airlines, Inc. ("American"), one of the

Debtors, under certain prepetition financing transactions.  U.S. Bank National Association ("U.S.

Bank"), in its capacity as loan trustee and security agent for these same prepetition financing

transactions, objects to the Motion by arguing, among other things, that American may not repay

those obligations without also paying a premium referred to as a "Make-Whole Amount."  For

the reasons set forth below, the Court agrees with the Debtors that the prepetition financing

transactions by their terms do not require payment of the Make-Whole Amount where, as here,

the obligations have been accelerated by virtue of the Debtors' filing for bankruptcy.

Accordingly, the Court grants the Debtors' Motion and overrules the objections of U.S. Bank.

The Court also denies U.S. Bank's related motion to lift the automatic stay to decelerate the amounts due under these financing transactions.

## BACKGROUND

On November 29, 2011, the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Prior to the bankruptcy, American was party to three separate financing transactions, each of which is secured by a discrete pool of aircraft (collectively, the "Aircraft"). One transaction, entered into in July 2009, involved the issuance of notes secured by certain of the Aircraft (the "2009-2 Secured Notes Financing").  The remaining two transactions were structured as enhanced equipment trust certificate ("EETC") financings, which involved the issuance of equipment notes secured by certain Aircraft.  The first EETC financing was entered into in July 2009 (the "2009-1 EETC Financing") and the second in October 2011 (the "2011-2 EETC Financing," and together with the 2009-2 Secured Notes Financing and the 2009-1 EETC Financing, the "Prepetition Financing").

Section 4.01(g) in each of the indenture agreements for the Prepetition Financing (collectively, the "Indentures") sets forth the circumstances that constitute an event of default of the agreement.[1]  That section specifically provides that, among other things, the filing of a voluntary bankruptcy petition constitutes an event of default.[2]  Section 4.02 of the Indentures

---

[1]    Despite minor variations, the applicable language in each of the Indentures is the same for purposes of the issues before this Court.

[2]    The relevant language of that section provides:

*Each of the following events shall constitute an "Event of Default"* whether such event shall be voluntary or involuntary or shall come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body and each such Event of Default shall be deemed to exist and continue so long as, but only as long as, it shall not have been remedied or explicitly waived: . . .

(g) *the Company shall file a voluntary petition in bankruptcy* or a voluntary petition or an answer seeking reorganization, liquidation or other relief as a debtor in a case under any bankruptcy laws or insolvency laws (as in effect at such time) or an answer admitting the material allegations of a

sets forth the remedies available upon an event of default.  On the one hand, the Loan Trustee

generally has the right to pursue remedies—but need not do so—for most events of default.  On

the other hand, Section 4.02 provides that some events of default automatically result in

acceleration of the Debtors' loan obligations without any further action by any party.  For

example, if an event of default under Section 4.01(g) of the Indentures occurs and is

continuing——such as the filing of a bankruptcy—the balance owing under the Prepetition Notes

is automatically accelerated and the unpaid principal amount, along with accrued but unpaid

interest, immediately becomes due and payable.

The Indentures also have a provision, Section 2.11, that permits American to voluntarily

redeem the notes issued under the Indentures (the "Prepetition Notes").  In the event of a

voluntary redemption, the Indentures spell out the items to be paid, including a "Make-Whole

Amount, if any":[3]

---

petition filed against the Company as a debtor in any such case, or the Company shall seek relief
as a debtor, by voluntary petition, answer or consent, under the provisions of any other bankruptcy
or other similar law providing for the reorganization or winding-up of corporations (as in effect at
such time), or the Company shall seek an agreement, composition, extension or adjustment with
its creditors under such laws. . . .

(2011-2 EETC Indenture § 4.01(g) (emphasis added); *see also* 2009-1 EETC Indenture § 4.01(g); 2009-2 Secured
Notes Indenture § 4.01(g)).

[3]       A Make-Whole Amount is defined in the Indentures as:

the amount (as determined by an independent investment banker selected by the Company (and,
following the occurrence and during the continuance of an Event of Default, reasonably acceptable
to the Loan Trustee)), if any, by which (i) the present value of the remaining scheduled payments
of principal and interest from the redemption date to maturity of such Equipment Note computed
by discounting each such payment on a semiannual basis from its respective Payment Date
(assuming a 360-day year of twelve 30 day months) using a discount rate equal to the Treasury
Yield plus the Make-Whole Spread exceeds (ii) the outstanding principal amount of such
Equipment Note plus accrued but unpaid interest thereon to the date of redemption.

(2011-2 EETC Indenture Annex A at A-13; *see also* 2009-1 EETC Indenture Annex A at A-12; 2009-2 Secured
Notes Indenture Annex A at A-12).  Make-Whole Amounts are generally understood to ensure that a lender receives
the benefit of its bargain for interest payments, but the entitlement to a Make-Whole Amount—and the amount of
any such payment—are a matter of contract.  *See HSBC Bank USA v. Calpine Corp.*, 2010 U.S. Dist. Lexis 96792,
at *14 (S.D.N.Y. Sept. 14, 2010); *In re Solutia, Inc.*, 379 B.R. 473, 485 n.7, 488 (Bankr. S.D.N.Y. 2007).

> [A]ll, but not less than all, of the Equipment Notes may be redeemed by the Company at any time upon at least 15 days' revocable prior written notice to the Loan Trustee and the Noteholders, and such Equipment Notes shall be redeemed in whole at a redemption price equal to 100% of the unpaid principal amount thereof, together with accrued and unpaid interest thereon to (but excluding) the date of redemption and all other Secured Obligations owed or then due and payable to the Noteholders, *plus Make-Whole Amount, if any* . . .

(2011-2 EETC Indenture § 2.11(a) (emphasis added); *see also* 2009-1 EETC Indenture § 2.11(a); 2009-2 Secured Notes Indenture § 2.20).  But no such Make-Whole must be paid where certain kinds of defaults have occurred, including the filing of a bankruptcy as contemplated under Section 4.01(g):

> If an Event of Default shall have occurred and be continuing and so long as the same shall continue unremedied, then and in every such case the Loan Trustee may, and upon the written instructions of a Majority in Interest of Noteholders, the Loan Trustee shall, do one or more of the following to the extent permitted by, and subject to compliance with the requirements of, applicable law then in effect: . . .
>
> (i) declare by written notice to the Company all the Equipment Notes to be due and payable, whereupon the aggregate unpaid principal amount of all Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount), shall immediately become due and payable without presentment, demand, protest or other notice, all of which are hereby waived; *provided that if an Event of Default referred to in Section 4.01(f), Section 4.01(g), Section 4.01(h) or Section 4.01(i) shall have occurred and be continuing, then and in every such case the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount)*, shall immediately and without further act become due and payable without presentment, demand, protest or notice, all of which are hereby waived. . . .

(2011-2 EETC Indenture § 4.02(a)(i) (emphasis added); *see also* 2009-1 EETC Indenture § 4.02(a)(i); 2009-2 Secured Notes Indenture § 4.02(a)(i)).

Almost one month after the filing of these bankruptcy cases, the Debtors proposed procedures to the Court to address the requirements of Bankruptcy Code Section 1110, which generally provides an exception to the automatic stay to permit an aircraft financer to repossess

6

its collateral 60 days after a bankruptcy filing unless the debtor agrees to cure any non-

bankruptcy defaults and perform under the agreement.  11 U.S.C. § 1110(a)(2); *see First Nat'l*

*Bank of Boston v. Shugrue (In re Ionosphere Clubs, Inc.)*, 123 B.R. 166, 169 (S.D.N.Y. 1991); *In*

*re Air Nat'l Aircraft Sales and Serv., Inc.*, 53 B.R. 310, 316 (Bankr. E.D.N.Y. 1985).  On

December 23, 2011, the Court entered an *Order Authorizing the Debtors to (I) Enter Into*

*Agreements Under Section 1110(a) of the Bankruptcy Code, (II) Enter Into Stipulations to*

*Extend the Time to Comply with Section 1110 of the Bankruptcy Code and (III) File Redacted*

*Section 1110(b) Stipulations* (ECF No. 455) (the "1110 Order").  The 1110 Order gave the

Debtors the authority to, among other things, (i) enter agreements (the "1110 Agreements")

committing to perform their obligations under various aircraft financing agreements, (ii) make

ongoing payments under such financing agreements, and (iii) cure certain defaults under the

financing agreements, all of which was necessary for the Debtors to gain the protection of the

automatic stay under Section 1110 of the Bankruptcy Code.  Under the procedures implemented

by the 1110 Order, the Debtors could make an 1110 Agreement by filing a notice of election

with respect to the applicable aircraft.  The Debtors filed notices of election with respect to each

of the three Prepetition Financings.[4]

    As of September 30, 2012, American was indebted in the principal amount of

$445,618,425 for the 2009-1 EETC Financing, $174,163,156 for the 2009-2 Secured Notes

Financing and $703,645,330 for the 2011-2 EETC Financing, plus all unpaid interest, fees, costs

and expenses under the applicable Indentures and related documents.  The current interest rates

---

[4]        On December 23, 2011, the Debtors filed a *Notice of Election Pursuant to Section 1110(a) of the
Bankruptcy Code With Respect to American Airlines 2009-1A EETC Aircraft Equipment* (ECF No. 462).  On
January 11, 2012, the Debtors filed a *Notice of Election Pursuant to Section 1110(a) of the Bankruptcy Code With
Respect to American Airlines 13.0% 2009-2 Senior Secured Notes Due 2016 Aircraft Equipment* (ECF No. 606) and
a *Notice of Election Pursuant to Section 1110(a) of the Bankruptcy Code With Respect to American Airlines 2011-2
EETC Aircraft Equipment* (ECF No. 608).

with respect to the Prepetition Notes are 10.375% for the 2009-1 EETC Financing, 13.0% for the 2009-2 Secured Notes Financing and 8.625% for the 2011-2 EETC Financing.

On October 9, 2012, the Debtors filed this Motion seeking authority to obtain new secured first priority financing in the amount of $1.5 billion and approval of the related security interest and liens on the Aircraft as part of a new EETC financing.  The Motion also requests authority to use cash on hand, including the proceeds of the proposed new financing, to repay its Prepetition Financing.  U.S. Bank objected to the Motion to the extent it seeks to repay the Prepetition Financing without a Make-Whole Amount.[5]  U.S. Bank argues that the Make-Whole Amount is due because the Debtors are voluntarily redeeming the Prepetition Notes.  The Debtors counter that their bankruptcy filing triggered an event of default which resulted in acceleration of the Prepetition Notes, and that under Section 4.02(a)(i) of the Indentures, the amounts due and payable include outstanding principal and interest, but not a Make-Whole Amount.  Oral argument on the motion was heard on November 8, 2012.  (*See* Hr'g Tr., ECF No. 5453).  Subsequent to that argument, U.S. Bank filed pleadings entitled "*Statement of U.S. Bank National Association . . . With Regard to the Applicability of the Automatic Stay to Rescission of Acceleration and Waiver of Events of Default*," suggesting that it sought the authority to lift the automatic stay to the extent that deceleration of the Prepetition Financing obligations was necessary to collect the Make-Whole Amount.  (ECF Nos. 5408, 5409).  U.S. Bank subsequently filed formal lift stay motions seeking that relief, which were heard by the Court on January 9, 2013.

The Motion states that the Debtors seek to enter into a new EETC financing to take advantage of the low interest rates currently available in that particular market, and of the ability

---

[5]     U.S. Bank filed two separate objections, one in its capacity as the Loan Trustee under the 2009-1 EETC Financing and 2011-2 EETC Financing and the other as the Trustee and Security Agent under the 2009-2 Secured Notes Financing.

of the EETC financing market to absorb a large securities issuance.  The Debtors seek to move

forward with the new financing to take advantage of the current market conditions, so as to

improve liquidity and achieve a competitive and sustainable cost structure.  The Debtors estimate

that the savings achieved from entering into a new financing with a reduced interest rate would

be in excess of $200 million.

## DISCUSSION

### A. Applicable Legal Standards

The Debtors' Motion seeks approval for the new financing under Section 364(c) of the

Bankruptcy Code.  In determining whether to approve a debtor's request under Section 364, a

Court must examine whether the relief requested is an appropriate exercise of the debtor's

business judgment.  *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party in interest.").  The Motion also seeks

authority to repay the Debtors' obligations under the Indentures pursuant to Section 363(b) of the

Bankruptcy Code, which permits a debtor, with prior court approval, to use, sell or lease

property, other than in the ordinary course of business.  11 U.S.C. § 363(b).  Courts in this

Circuit have held that such transactions should be approved when they are supported by sound

business reasons.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722

F.2d 1063, 1071 (2d Cir. 1983); *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y.

2011); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).  "Although the

determination of what constitutes a sufficient business reason depends on the facts and

circumstances of each case, a debtor often satisfies the business judgment standard if 'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' . . . Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross-negligence.'" *In re Borders Grp., Inc.*, 453 B.R. at 482 (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

In addition to the Debtors' request for financing and use of estate assets, the Motion also requires the Court to opine about the legal rights of the parties under the Indentures, specifically whether a Make-Whole Amount must be paid by the Debtors. The Declaratory Judgment Act provides, in part, that

> [i]n a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree . . . .

28 U.S.C. § 2201(a). The purpose of the Declaratory Judgment Act is to "enable parties to adjudicate disputes before either of them [have] suffered great harm." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 381 (S.D.N.Y. 2007) (citing *In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35, 36 (2d Cir. 1988)). In determining whether a party has standing to seek a declaratory judgment, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). A court has wide discretion in determining whether a declaratory judgment is appropriate in a particular dispute. *See Russian Standard Vodka*, 523 F. Supp. 2d at

382 (citing *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675 (2d Cir. 1996)).  The Court finds that the present dispute satisfies the requirements for a declaratory judgment.

   One of the objections initially made by U.S. Bank was that the Debtors' request for relief was brought by motion and not an adversary proceeding.  (*See* Secured Notes Sur-Reply ¶ 1; EETC Sur-Reply ¶¶ 4-5) (citing Bankruptcy Rule 7001(2)) (providing that "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" is an adversary proceeding); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993).  To avoid any procedural impediments to resolving the present dispute, the parties subsequently agreed that the Motion and the responses of U.S. Bank can be considered as cross-motions for summary judgment in the above-captioned adversary proceedings, which were filed by U.S. Bank to seek a declaratory judgment on the same issue. (*See* Stipulation and Order) (ECF No. 6203).[6]

### B. <u>Contractual Interpretation</u>

   The Indentures are governed by New York law.  (*See* 2011-2 EETC Indenture § 10.15; 2009-1 EETC Indenture § 10.15; 2009-2 Secured Notes Indenture § 13.17).  Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  "Whether or not a

---

[6]    On an unrelated procedural note, U.S. Bank objects to the Debtors having made new arguments in their Reply.  It is within the Court's discretion whether to consider arguments raised for the first time in reply papers. *See Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent, Inc.)*, 326 B.R. 219, 229 (S.D.N.Y. 2005).  The Court overrules this objection, finding that U.S. Bank has had more than adequate opportunity to address the issues raised in the Debtors' Reply, as U.S. Bank subsequently filed two sur-replies (without receiving this Court's prior permission) and all parties had ample opportunity to argue all issues at a lengthy hearing.  (*See* Hr'g Tr., Nov. 8, 2012, ECF. No. 5453).

writing is ambiguous is a question of law to be resolved by the courts . . . . It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Id*. at 162-63 (internal citations and quotations omitted).

"A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009) (internal citations omitted). "[S]pecific clauses of a contract are to be read consistently with the over-all manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms." *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div. 1989) (internal citations omitted).

### C.  Language of the Indentures

In analyzing whether a Make-Whole Amount is due, the Court turns first to the provision of the Indentures that most specifically addresses the circumstance before the Court. That provision is Section 4.01(g), which provides that the filing of a voluntary bankruptcy constitutes an event of default. The consequences of such a default are set forth in the Indentures. While many of the defaults specified in Section 4.02(a)(i) give the Loan Trustee the right—but not the obligation—to exercise various remedies, a bankruptcy default under Section 4.01(g) automatically results in acceleration without any action by the Loan Trustee. This same section also specifically provides that the Debtors are not required to pay any Make-Whole Amount where there has been such a default and resulting acceleration:

> . . . *if an Event of Default referred to in Section 4.01(f), Section 4.01(g), Section 4.01(h) or Section 4.01(i) shall have occurred and be continuing, then and in*

> *every such case the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount), shall immediately and without further act become due and payable* without presentment, demand, protest or notice, all of which are hereby waived . . . .*

(2011-2 EETC Indenture § 4.02(a)(i) (emphasis added); *see also* 2009-1 EETC Indenture § 4.02(a)(i); 2009-2 Secured Notes Indenture § 4.02(a)(i)).  Under the plain language of the Indentures, therefore, the Debtors are not required to pay the Make-Whole Amount where a bankruptcy default under Section 4.01(g) has triggered an automatic acceleration of the amounts due under the Prepetition Notes "without Make-Whole Amount."[7]  *See HSBC Bank USA v. Calpine Corp.*, 2010 U.S. Dist. Lexis 96792, at *14 (S.D.N.Y. Sept. 14, 2010); *In re Solutia, Inc.*, 379 B.R. 473, 485 n.7, 488 (Bankr. S.D.N.Y. 2007).

This conclusion is supported by the language in Section 3.03 of the Indentures, which similarly provides that no Make-Whole Amount is due under these circumstances.  Section 3.03 describes the priority for distribution of payments after a default.  It specifically states that "[n]o Make-Whole Amount shall be payable on the Equipment Notes as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes."  (2011-2 EETC Indenture § 3.03; *see also* 2009-1 EETC Indenture § 3.03; 2009-2 Secured Notes Indenture § 3.03).  The broad language in Section 3.03—"in connection with an Event of Default . . . .or acceleration"—clearly covers the situation at hand, which involves both an Event of Default and an acceleration.  And while the phrase "in connection with" is not defined under the

---

[7]    And as the Debtors observe, the filing of a bankruptcy petition—even without specific contractual language—acts to accelerate all of a debtor's obligations by operation of law.  *See HSBC Bank USA v. Calpine Corp.*, 2010 U.S. Dist. Lexis 96792 at *10 (S.D.N.Y. Sept. 14, 2010) (citing, *inter alia, In re Granite Broad. Corp.*, 369 B.R. 120, 144 (Bankr. S.D.N.Y. 2007); *In re Manville Forest Prods. Corp.*, 43 B.R. 293, 297-98 (Bankr. S.D.N.Y. 1984)); *see also* 11 U.S.C. § 502 (providing that a claim may be allowed regardless of its status as contingent or unmatured).  As the specific language of the Indentures makes clear the parties' intent here, however, the Court does not need to look beyond the controlling language of the operative contract.

Bankruptcy Code, the Court notes that it has been given a broad construction in other contexts such as securities law. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85-86 (2006); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010).

**D.   U.S. Bank Arguments**

Notwithstanding the language of Sections 4.01(g), 4.02 and 3.03, U.S. Bank nonetheless contends that the Make-Whole Amount must be paid here.  U.S. Bank's arguments fall into three categories.  U.S. Bank first argues that the Debtors have misconstrued the provisions of Section 4.02.  U.S. Bank next asserts that the current situation is controlled not by Section 4.02 but by Section 2.11 regarding voluntary repayment.  Lastly, U.S. Bank contends that the Debtors' position is inconsistent with their election under Section 1110 as to the Prepetition Financing. The Court will address each of these issues separately.

1.   Operation of Section 4.02

U.S. Bank first argues that Section 4.02(a)(i), which provides for the acceleration of these obligations, does not apply because U.S. Bank as Loan Trustee did not affirmatively accelerate the debt.  But the language of the Indentures does not support U.S. Bank's position.  While certain events of default permit U.S. Bank the option of pursuing various remedies, that is not the case for acceleration by virtue of a bankruptcy default under Section 4.01(g):

> if an Event of Default referred to in . . . Section 4.01(g) . . . shall have occurred and be continuing, *then and in every such case* the unpaid principal amount of the Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the avoidance of doubt, without Make-Whole Amount), *shall immediately and without further act become due and payable without presentment, demand, protest or notice, all of which are hereby waived*. . . .

(Section 4.02(a)(i) (emphasis added)).  Thus, under the Indentures, the unpaid principal amount of the notes, along with accrued but unpaid interest, automatically became due and owing upon

the filing of the Debtors' bankruptcy.  Indeed, U.S. Bank seems to have conceded as much in the

proofs of claim it filed in these bankruptcy cases.  These proofs of claim cite to Section 3.03,

which is the waterfall provision for the distribution of payments after an event of default.  (*See*

Debtors' Reply, Exs. A at ¶ 17, B at ¶ 18, C at ¶ 10).[8]

U.S. Bank mistakenly contends that acceleration under New York law is a remedy that

must be chosen by the lender and cannot be invoked by the borrower.  To support its position,

U.S. Bank relies on a 1942 decision in *Wurzler v. Clifford*, 36 N.Y.S.2d 516, 517 (Sup. Ct. 1942)

and a 1963 decision in *Tymon v. Wolitzer*, 240 N.Y.S.2d 888, 895 (Sup. Ct. 1963).  These two

cases hold that the acceleration provisions at issue were not self-operative and that the creditor

had the option of electing to accelerate the debt to maturity, noting that to hold otherwise "would

take the option of accelerating or not accelerating away from the pledgee *for whose benefit the

clause is placed in the contract* and give it to the pledgor."  *Tymon*, 240 N.Y.S.2d at 896

(emphasis in original); *see Wurzler* 36 N.Y.S.2d at 517.  But both cases deal with bare bones

acceleration clauses, which simply state that upon default, obligations owing are due and payable

immediately.[9]  Thus, the question before these courts was how to properly construe such basic

---

[8]         Through other actions, U.S. Bank appears to acknowledge that the underlying default currently exists under
Sections 4.01 and 4.02.  *See, e.g.*, U.S. Bank Corporate Trust Services Letter re: American Airlines Pass Through
Certificates Series 2011-2A, dated October 15, 2012 (Debtors' Reply, Ex. E) ("American, its parent and certain of
its affiliates . . . filed for reorganization under Chapter 11 of the Bankruptcy Code . . . on November 29, 2011.  Such
a filing constitutes an Indenture Event of Default under the Indentures and a Triggering Event under the Intercreditor
Agreement."); Shipman & Goodwin LLP Information Request re: American Airlines 2009-2 Secured Notes, dated
July 27, 2012 (Debtors' Reply, Ex. F) (seeking information under Section 10.02(f) of the Indenture, which allows
the Trustee to request certain aircraft-related information after the occurrence of a bankruptcy Event of Default and
while any such Event of Default shall be continuing).  *C.f., In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir.
1984) ("[A] lender may abandon or waive its claim to interest payable over a period of years and to what amounts to
insurance against a decline in interest rates.  Thus, the lender, by its acts, may establish that it prefers accelerated
payment to the opportunity to earn interest over a period of years.").

[9]         For example, the *Wurzler* acceleration clause stated simply that:

          Any default by the party of the second part to pay any of the premiums on the said insurance
          policy or any payments due to the said party of the first part on account of said note, shall operate
          to make the balance of said obligation owing by the party of the second part to the party of the first
          part, due and payable forthwith.

clauses given the absence of further guidance in those agreements.  Accordingly, these decisions

"established a rule of construction for similar [basic] acceleration clauses, but not a general

prohibition on all self-operative acceleration clauses."  *Premier Entm't Biloxi LLC v. U.S. Bank*

*Nat'l Assoc. (In re Premier Entm't Biloxi LLC)*, 445 B.R. 582, 627 (Bankr. S.D. Miss. 2010)

(citing 1 Mortgages and Mortgage Foreclosure in New York § 28:6 (2009)) ("If so specifically

written, it is possible for an acceleration clause to be self-executing.").  Not surprisingly then,

other courts have noted that the *Tymon* decision "did not foreclose the ability of parties to draft

acceleration provisions that would be self-operative. . . ."  *See In re Premier Entm't*, 445 B.R. at

627 (interpreting New York law).  The parties here have done just that.  The language here

expresses the parties' clear intention that acceleration is automatic in the event of a bankruptcy

filing, thereby avoiding the need to resort to the rule of construction established in *Tymon* and

*Wurzler.  See id.* at 628.  Indeed, numerous courts have applied such automatic acceleration

clauses with little comment.  *See, e.g., In re Solutia*, 379 B.R. at 484 ("It was entirely appropriate

to provide for automatic acceleration in the Original Indenture. . . ."); *Calpine Corp.*, 2010 U.S.

Dist. Lexis 96792, at *10 ("According to the terms of the notes, a voluntary bankruptcy filing

constitutes an event of default that accelerates and matures the notes. . . ."); *Premier Entm't*, 445

B.R. at 628, 631 (citing*, inter alia, Fifty States Mgt. Corp. v. Pioneer Auto. Parks, Inc.*, 46

N.Y.2d 573, 577 (1979) ("[A]greements providing for the acceleration of the entire debt upon

the default of the obligor . . . [i]n the vast majority of instances . . . have been enforced at law in

accordance with their terms.")); *see also Key Int'l Mfg. Inc. v. Stillman*, 480 N.Y.S.2d 528, 530-

---

*Wurzler*, 36 N.Y.S.2d at 517.

31 (App. Div. 1984) (holding that acceleration clauses are quite common and are generally enforceable according to their terms).[10]

Furthermore, for reasons explained in *Premier Entertainment*, the policy considerations raised in *Tymon* and *Wurzler* are not present in these circumstances.  Those two courts expressed concern that holding a bare bones acceleration clause to be self-operative would permit a borrower to intentionally default when market conditions render the loan unfavorable, thereby requiring a lender to accept immediate repayment.  *See Tymon*, 240 N.Y.S.2d at 896; *Wurzler* 36 N.Y.S.2d at 517-18.  As the court explained in *Premier Entertainment*, "[b]ecause the acceleration clause in *Tymon* provided for automatic acceleration upon any default, a borrower could exploit this provision by simply foregoing an interest payment."  *In re Premier Entm't*, 445 B.R. at 628 (citing *Tymon*, 240 N.Y.S.2d at 893-96).  The circumstances here are different.  The default provisions of these Indentures provide for automatic acceleration only if American finds itself in bankruptcy or other insolvency proceedings or through the appointment of a receiver, trustee or liquidator.  These defaults are specifically carved out from other events of default, where the Loan Trustee has the option of calling a default before the Prepetition Notes would be accelerated.[11]  As the court in *Premier Entertainment* correctly observed,

---

[10]     For its argument, U.S. Bank also relies upon the statement in *In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984) that "acceleration *appears to be* a conditional right of the lender. . . ." *Id.* at 332 (emphasis added).  But that case offers no support for U.S. Bank's argument. The language of that acceleration clause provided that the lender could, "without notice, . . . declare the remainder of the debt at once due and payable." *Id.* at 331.  Thus, the lender's option in *LHD Realty* was markedly different from the automatic acceleration clause here.

[11]     The Indentures provide, in relevant part:

> If an Event of Default shall have occurred and be continuing and so long as the same shall continue unremedied, *then and in every such case the Loan Trustee may, and upon the written instructions of a Majority in Interest of Noteholders, the Loan Trustee shall, do one or more* of the following to the extent permitted by, and subject to compliance with the requirements of, applicable law then in effect: . . .

> (i) declare by written notice to the Company all the Equipment Notes to be due and payable, whereupon the aggregate unpaid principal amount of all Equipment Notes then outstanding, together with accrued but unpaid interest thereon and all other amounts due thereunder (but for the

17

It would not be necessary to distinguish defaults by bankruptcy from defaults by other means if the parties did not intend for acceleration to take place automatically in some instances. Because the Indenture's acceleration clause contained this specific, bargained-for exception, *Tymon's* construction rule that automatic acceleration clauses are not self-operative does not apply. To hold otherwise would contravene well-settled cannons of contract interpretation: (1) that a contract should be interpreted "to give effect to all of its provisions;" and (2) that a contract must not be construed in a way that "would render a contractual provision meaningless or without force or effect."

*Premier Entm't*, 445 B.R. at 628-29 (quoting *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP*, 6 N.Y.3d 371, 374 (N.Y. 2006); *Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (N.Y. 1996)).

Even assuming that acceleration has taken place here, however, U.S. Bank contends that it may simply waive the event of default and decelerate the debt.  It relies upon Section 4.02(d) of the Indentures, which provides:

At any time after the Loan Trustee has declared the unpaid principal amount of all Equipment Notes then outstanding to be due and payable, or all Equipment Notes shall have become due and payable as provided in the proviso to Section 4.02(a)(i),and, in either case, prior to the sale of any part of the Collateral pursuant to this Article IV, a Majority in Interest of Noteholders, by written notice to the Company and *the Loan Trustee, may rescind and annul such declaration, whether made by the Loan Trustee on its own accord or as directed or deemed declaration, and its consequences if*: (i) there has been paid to or deposited with the Loan Trustee an amount sufficient to pay all overdue installments of principal amount of, and interest on, the Equipment Notes, and all other amounts owing under the Operative Documents, that have become due otherwise than by such declaration of acceleration and (ii) all other Events of Default, other than nonpayment of principal amount or interest on the Equipment Notes that have become due solely because of such acceleration, have been either cured or waived; provided that no such rescission or annulment shall extend to or affect any subsequent default or Event of Default or impair any right consequent thereon.

---

avoidance of doubt, without Make-Whole Amount), shall immediately become due and payable without presentment, demand, protest or other notice, all of which are hereby waived. . . .

(2011-2 EETC Indenture § 4.02(a)(i) (emphasis added); *see also* 2009-1 EETC Indenture § 4.02(a)(i); 2009-2 Secured Notes Indenture § 4.02(a)(i)).

(Indentures § 4.02(d) (emphasis added)).  U.S. Bank argues that under this provision, it can rescind any event of default, so long as the Debtors are current on the principal and interest payments under the Notes and all other events of default that have become due on account of the acceleration have been waived (other than the nonpayment of principal and interest).  Because the Debtors have remained current on their principal and interest payments under the Section 1110 Agreement, U.S. Trustee argues that these conditions have been met.

Any deceleration of these notes, however, is barred by the automatic stay imposed by the filing of this bankruptcy.  *See In re Solutia, Inc.*, 379 B.R. 473.  The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws."  *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Prot.*, 474 U.S. 494, 503 (1986).  It maintains the status quo and protects the debtor's ability to formulate a plan for the sale or other disposition of property of the estate.   Collier on Bankruptcy ¶ 362.03 (16th ed. rev. 2012).  Among other things, it bars a creditor from taking actions to exercise control over property of the estate or assess claims against the estate.  *See* 11 U.S.C. § 362(a).  Section 541(a)(1) of the Bankruptcy Code broadly defines property of the estate to include, "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541 (2003); *see also 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 430 (2d Cir. 1987); *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 729 (9th Cir. 1987).  "Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay."  *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) (quoting *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus. Inc. (In re Elder–Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996).

In *Solutia*, the filing of bankruptcy was an event of default that automatically accelerated the debt.  The noteholders subsequently sent a notice of deceleration to the debtors and, therefore, contended that they were entitled to a form of contractual interest that would be triggered by events occurring in the bankruptcy if there was no acceleration.  The Court held that the notice of deceleration was void because it violated the automatic stay.  The Court held that

> where the indenture provides for automatic acceleration any attempt at [deceleration] would violate the automatic stay since it is a direct attempt to get more property from the debtor and the estate, either through a simple increase in the amount of a pro-rata plan distribution or through recovery of a greater amount of the collateral which secures the claim.  In either case, [deceleration] is an attempt to 'assess' an increased claim against the amount of the surplus that would otherwise be available to the estate and creditors.

379 B.R. at 485.  The same rationale applies with equal force here.  A deceleration of these notes would have the effect of assessing the Debtors with a Make-Whole not currently owed under the Indentures, and thwart Debtors' reliance on the Indentures as written.  *See id.* at 485 n.11; *In re LHD Realty Corp.*, 726 F.2d 327, 332 (7th Cir. 1984) (holding lender loses right to a premium when it elects to accelerate the debt and declining to allow lender to avoid the consequences of its choice of acceleration); *In re Adu-Kofi*, 94 B.R. 14 (Bankr. R.I. 1988).[12]

Perhaps recognizing the weakness in its position, U.S. Bank informed the Court, subsequent to the Debtors' Motion being fully briefed and argued, that it intended to file a motion to lift the automatic stay for permission to decelerate the debt.  U.S. Bank's filing of the lift stay motion appeared to be a result of the Court's questioning during oral argument on the Motion.

---

[12]    U.S. Bank attempts to distinguish *Solutia* because in that case the indenture only permitted a deceleration "that was caused by the giving of a 'notice of acceleration,'" but acceleration had occurred automatically under the language of the indenture and was not the result of any notice.  *See Solutia*, 379 B.R. at 483.  But the court's finding in *Solutia* that deceleration violated the stay was not based on this aspect of the contract.

In any event, the Court finds that lifting the stay is not appropriate here. Section
362(d)(1) of the Bankruptcy Code provides, in relevant part, that "the court shall grant relief
from the stay . . . (1) for cause, including the lack of adequate protection of an interest in
property of such party in interest. . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not,
however, define the phrase "for cause," but the courts recognize it as a broad and flexible
concept that must be determined on a case-by-case basis. *Spencer v. Bogdanovich (In re
Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *Mazzeo v. Lenhart (In re Mazzeo)*, 167
F.3d 139, 143 (2d Cir. 1999)). In determining whether "cause" exists to lift the stay for
prepetition litigation, courts in this Circuit consider twelve factors (the "Sonnax Factors"). *See
Sonnax Indus., Inc. v. Tri Component Prod. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280,
1286 (2d Cir. 1990); *In re New York Med. Grp., PC*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001).
While many of these factors specifically relate to efforts to lift the stay to pursue proceedings in
other courts, the twelve factors also include more general considerations that are applicable here,
including the lack of any connection with or interference with the bankruptcy case and the
impact of the stay on the parties and the balance of harms. Applying these principles here, there
are several difficulties with U.S. Bank's request to lift the stay.

As a threshold matter, U.S. Bank's efforts to lift the automatic stay run counter to its
argument that the debt was not accelerated. The Court is troubled, moreover, that U.S. Bank is
attempting, after the Motion was submitted *sub judice* and more than one year into these cases, to
change the facts on the ground by seeking to lift the stay. Indeed, the stay issue was only raised
by U.S. Bank after the Debtors sought to pay the balance of the Prepetition Notes. Thus, it is
clear at this point that deceleration would serve only to increase the size of U.S. Bank's claim. It
would thus affect the Debtors' contractual rights, which are property of the estate, to the

21

detriment of the estate and the Debtors' other creditors and only for the benefit of U.S. Bank.

*See Official Comm. of Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines Inc.)*, 928 F.2d 565, 573 (2d Cir. 1991) ("One of the principal purposes of the automatic stay is to preserve the property of the debtor's estate for the benefit of all the creditors.").  As the Debtors correctly note, the usual ground for lifting the stay for a secured creditor is to secure adequate protection of the creditor's rights, which usually comes in the form of periodic payments to the creditor.  But that is not an issue here given that, pursuant to Debtors' Section 1110 Elections, U.S. Bank is receiving the contractual payments that it is due under the Indentures.  Given the obvious harm to the estate from such a contractual modification now, the Court concludes that U.S. Bank has not satisfied its burden for lifting the stay under Section 362 of the Bankruptcy Code and rejects U.S Bank's argument of bad faith as a basis to lift the stay. *See In re Solutia*, 379 B.R. at 485; *see also In re Kaplan Beslaw Ash, LLC*, 264 B.R. 309, 333-35 (Bankr. S.D.N.Y. 2001).

Finally, U.S. Bank argues that even if Section 4.02(a)(i) automatically accelerated the Notes upon the Debtors' bankruptcy filing, it is an *ipso facto* clause and is therefore unenforceable against the Debtors under bankruptcy law.  An *ipso facto* clause is a clause in a contract or lease "that modif[ies] the relationship of contracting parties due to the filing of a bankruptcy petition."  *Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, 1993 U.S. Dist. Lexis 6130, at *14 (S.D.N.Y. May 10, 1993).  In its papers, U.S. Bank relies principally upon the language of Section 365(e)(1), which provides, in relevant part:

> an executory contract or unexpired lease of the debtor *may not be terminated or modified*, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely *because of a provision in such contract or lease that is conditioned on-- (A) the insolvency* or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title. . . .

22

11 U.S.C. § 365(e)(1) (emphasis added).  Citing to *In re W.R. Grace & Co.*, 475 B.R. 34, 154 (D.

Del. 2012), U.S. Bank argues that the prohibition against *ipso facto* clauses is not limited to the

circumstances set forth in Section 365(e) of the Bankruptcy Code but applies more generally.

   But numerous courts in this jurisdiction have held that "[a]s a matter of statute, the

question whether a bankruptcy default clause should be treated as an invalid *ipso facto* clause

depends on whether the contract at issue is an executory contract or unexpired lease." *In re Gen.*

*Growth Props., Inc.*, 451 B.R. 323, 329 (Bankr. S.D.N.Y. 2011) (citing 11 U.S.C. § 365(e)(1));

*see also In re St. Vincent's Catholic Med. Ctrs.*, 440 B.R. 587, 601 (Bankr. S.D.N.Y. 2010); *cf.*

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. (In re Lehman Bros. Holdings Inc.)*,

422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010).  This result comports with the plain language of the

statute, which covers only "an executory contract or unexpired lease of the debtor. . . ."  11

U.S.C. § 365(e)(1).  Thus, *ipso facto* clauses "are not *per se* invalid in [this jurisdiction] except

where contained in an executory contract or unexpired lease." *In re Gen. Growth Props.*, 451

B.R. at 330, *appeal pending*, ECF Nos. 6974, 6975.  The court in *General Growth* observed that

Section 365's prohibition on *ipso facto* clauses "represented a departure from the treatment of

*ipso facto* clauses under the prior Bankruptcy Act,"—namely that they were permitted— and the

court did not understand "why Congress [would] single[] out only executory contracts and

unexpired leases for special treatment under Section 365(e)(1) when it could have spoken in

broader terms." *Id.* at n.12.  The court in *General Growth* also noted that case law reaching a

different result "failed to explain why the legislative history explaining a prohibition on *ipso*

*facto* clauses in executory contracts and unexpired leases should apply to other types of

contracts." *Id.*  This Court is persuaded by the reasoning in *General Growth*, given that

Congress is generally presumed to be "knowledgeable about existing law pertinent to legislation

it enacts," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988), and thus courts do not generally infer that Congress overruled such existing law except where it explicitly does so.[13] As both U.S. Bank and the Debtors admit that the Indentures here are not executory contracts or unexpired leases (Hr'g Tr. 84:11-21, Nov. 29, 2012), the Court concludes that Section 4.02(a)(i) is not an invalid *ipso facto* clause.[14]

U.S. Bank lists other provisions of the Bankruptcy Code that touch upon *ipso facto* clauses, including Sections 363(l), 541(c)(1)(B) and 1110(a)(2)(B), but U.S. Bank provides little or no explanation of how they support its position here.  And, in fact, these provisions do not. Section 541 addresses what constitutes property of the estate, and Section 363 relates to the use, sale and lease of property.  Nothing in the plain language of either section supports U.S. Bank's position here.  Indeed, the argument that Section 541 invalidates Section 4.02(a)(i) of the Indentures is counterintuitive.  The purpose of Section 541 is to prevent contractual language from interfering with a debtor's interest in property becoming property of the estate.  But if the Court were to invalidate Section 4.02(a)(i) of the Indentures as an *ipso facto* clause, it would in fact harm the estate by depriving the Debtors of a valuable contractual right, namely the right to not pay a Make-Whole Amount.  As for Section 1110(a)(2)(B), it provides that a secured lender, lessor or vendor with respect to aircraft may repossess its collateral and enforce its contractual rights if the debtor does not cure any contractual defaults, "other than a default of a kind

---

[13]      While the Court finds the *General Growth* decision to be persuasive, it is not clear that the reasoning of *W.R. Grace* would apply to the facts here in any event.  *W.R. Grace* found several key factual distinctions between its facts and those in *General Growth Properties*, including: (i) the creditor in *General Growth* was a secured creditor whereas the creditor in *W.R. Grace* was unsecured; (ii) the default clause in *General Growth* was automatic and did not require the creditor provide notice of default, whereas the clause in *W.R. Grace* required notice prior to calling a default; and (iii) the debtors in *General Growth* were unquestionably solvent, whereas the solvency of the debtor in *W.R. Grace* was "an issue of hot dispute."  *See W.R. Grace*, 451 B.R. at 161 n.133.  The Court notes that the instant dispute is also factually distinguishable from the *W.R. Grace* case.

[14]      The court in *General Growth* also notes that courts will sometimes choose not to enforce a bankruptcy default clause where it may impede the debtor's "fresh start."  451 B.R. at 330-331.  But enforcement of the default clause in these circumstances will do just the opposite by saving the estate and its creditors several hundred million dollars.

specified in section 365(b)(2). . . ."  11 U.S.C. § 1110(a)(2)(B).  U.S. Bank claims without further explanation that Section 4.02(a)(i) is a "classic example of the sort of *ipso facto* clause which section 1110(a)(2)(B), through section 365(b)(2), renders unenforceable against a debtor." (Secured Notes Objection ¶ 45).  But Section 1110(a)(2)(B) does not, in fact, affirmatively nullify the contractual provision itself as do Sections 365, 541 and 363.[15]  Rather, it simply provides that even if such a default exists, a debtor need not cure it.

   2.   Voluntary Redemption

   U.S. Bank argues that the proposed transaction must be viewed as a voluntary redemption because the Debtors seek to take advantage of more favorable interest rates.  As such, U.S. Bank contends that a Make-Whole Amount must be paid pursuant to Section 2.11(a) of the Indentures. U.S. Bank notes that under New York law, a borrower may not pay an obligation prior to the stated maturity date unless it is permitted to do so under the governing contract.[16]  In U.S. Bank's view, Section 2.11(a) is the only provision in the Indentures that provides for the Debtors' contemplated repayment.

---

[15]     For instance, Section 365 provides that "an executory contract or unexpired lease of the debtor *may not be terminated or modified*, and any right or obligation under such contract or lease *may not be terminated or modified* . . . solely because of a provision conditioned on" a bankruptcy filing.  11 U.S.C. § 365(e)(1) (emphasis added). Section 541 states that an interest of the debtor in property becomes property of the estate . . . *notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law* . . . that is conditioned on" a bankruptcy.  11 U.S.C. § (c)(1)(B) (emphasis added).  Section 363 provides that "the trustee may use, sell, or lease property . . . *notwithstanding any provision in a contract, a lease, or applicable law* that is conditioned on" a bankruptcy filing.  11 U.S.C. § 363(l) (emphasis added).  In comparison, Section 1110 states that "any default, *other than a default of a kind specified in section 365(b)(2)*, under such security agreement, lease, or conditional sale contract" must be cured.  11 U.S.C. § 1110(a)(2)(B) (emphasis added).

[16]     *See, e.g., Arthur v. Burkich*, 131 A.D.2d 105, 106, 520 N.Y.S.2d 638, 639 (App. Div. 1987) ("It has been settled law since the early 19th century that a mortgagor has no right to pay off his obligation prior to its stated maturity date in the absence of a prepayment clause in the mortgage or contrary statutory authority.") (internal citations omitted).

But under the language of the Indentures, the Debtors are not restricted to repaying the entire Prepetition Notes solely through a voluntary redemption. Rather, the Debtors are paying the Prepetition Notes because the amounts due thereunder have been accelerated as a result of the Debtors' bankruptcy filing. *See In re Solutia*, 379 B.R. at 488 ("Because the [notes] were automatically accelerated, any payment at this time would not be a prepayment. Prepayment can only occur *prior* to the maturity date.") (citing *LHD Realty Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984)). Thus, the Debtors' payment here will be a "post-maturity date repayment," not a prepayment. *In re Solutia*, 379 B.R. at 488. The issue should, therefore, not be viewed as simply one of "voluntary" or "involuntary" payments. The Indentures instead distinguish between amounts due in connection with redemption of the Prepetition Notes and amounts due in connection with acceleration. Indeed, the granting clause of the Indentures recognizes this distinction in stating that the Indentures secure "the prompt and complete payment (*whether at stated maturity, by acceleration or otherwise*) of principal of, interest on . . . and Make-Whole Amount, if any, with respect to, and all other amounts due under, the . . . Notes." (2011-2 EETC Indenture at 2; 2009-1 Indentures at 1; 2009-2 Secured Notes Financing Indenture at 2 (emphasis added)). In the same vein, Section 3.03 of the Indentures describes the order of priority for "*all payments received* . . . after both an Event of Default shall have occurred and be continuing and the Equipment Notes shall have become due and payable pursuant to Section 4.02(a)." (2011-2 EETC, 2009-1 and 2009-2 Secured Notes Financing Indentures at §3.03 (emphasis added)). Section 3.03 does not distinguish between whether such payments are voluntary but it specifically states that a Make-Whole Amount is not due and payable under these circumstances.

There is other language in the Prepetition Notes that confirm this interpretation of the parties' agreement. The Prepetition Notes issued under to the 2009-1 EETC and the 2011-2

EETC Financings distinguish between redemption and acceleration. Each Note states that it "is subject to redemption as provided in Section 2.10, Section 2.11 and Section 2.12 of the Indenture but not otherwise. In addition, this [Note] may be accelerated as provided in Section 4.02 of the Indenture." (2009-1 and 2011-2 EETC Indentures § 2.01). Similarly, the EETC Notes state that "no payment" will be made after the commencement of a bankruptcy proceeding except "as expressly provided in Article III" of the applicable Indenture. *See id.* Article III of Indenture includes Section 3.03, which sets out the priority of payments after an event of default and confirms that "[n]o Make-Whole Amount shall be payable on the . . . Equipment Notes as a consequence of or in connection with an Event of Default or the acceleration of the Equipment Notes." (2011-2 EETC and 2009-1 EETC Indentures § 3.03).[17]

The case law confirms this result. In *Calpine Corp.*, 2010 U.S. Dist. Lexis 96792, the District Court held that the debtors did not incur liability under a "no-call" provision that

---

[17]    U.S. Bank argues that this is an incorrect interpretation of the contract because Article III also includes Section 3.02, which provides for the distribution of payments in the event of a voluntary redemption and requires payment of a Make-Whole Amount. However, Section 3.02 begins with the language "Except as otherwise provided in Section 3.03 . . .", thus establishing that Section 3.03 takes precedence over Section 3.02. Section 3.02 also makes no reference to payments with respect to an event of default, a topic specifically addressed by Section 3.03. The specific language relating to the treatment of payments with respect to events of default overrides the general language of Section 3.02 which relates to payments in the event of a voluntary redemption. *See County of Suffolk v. LILCO*, 266 F.3d 131, 139 (2d Cir. 2001) ("It is axiomatic that courts construing contracts must give 'specific terms and exact terms … greater weight than general language.") (citing *Aramony v. United Way*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting Restatement (Second) of Contracts§203(c) (1981); *see Aramony* at 413-14 ("[E]ven when there is no 'true conflict' between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."); see also *Bowmer v. Bowmer*, 50 N.Y.2d 288, 294 (1980); *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."). Additionally, when general and specific provisions of a contract are inconsistent, "the specific provision controls." *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956); *see also Aguirre v. City of New York*, 625 N.Y.S.2d 597, 598 (App. Div. 1995); 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32.10 (4th ed. 1999 & Supp. 2010) ("Where general and specific clauses conflict, the specific clause governs the meaning of the contract. . . Even absent a true conflict, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."); 5 Margaret N. Kniffin, Corbin on Contracts § 24.23 (Rev. ed. 1998) ("If the apparent inconsistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage, the more specific term should usually be held to prevail over the more general term."); *Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3 (2009) (stating that if contractual provisions are irreconcilable, "'the more specific clause controls the more general'") (quoting 11 Williston & Lord, supra, § 32:15).

prohibited repayment prior to a certain fixed date, despite the debtors' repayment of the obligations prior to the date in question.  The District Court found that under the terms of the notes, a voluntary bankruptcy constituted "an event of default that accelerates and matures the notes, thus making them due and payable immediately.  Even without these provisions, the Bankruptcy Code would require the same result, as the filing of a bankruptcy petition renders all of a petitioner's outstanding debts mature and payable."  *Id.* at *10.  As to the damages sought for the interest payments lost over the life of the loan, the District Court stated that "[w]hile [the] Trustee may not recover expectation damages for Debtor's repayment of the notes despite the no-call provisions, the notes could have provided for the payment of premiums in the event of payment pursuant to acceleration . . . Without such a provision, however, no damages are recoverable after acceleration."  *Id.* at *14.

        In *In re Solutia*, 379 B.R. 473, the indenture in question provided for automatic acceleration upon a bankruptcy filing.  The indenture contained a provision that the payments be made when due, but did not include any language regarding the payment of a premium, whether upon acceleration or otherwise.  The court refused to interpret the contract to provide for any type of prepayment premium or expectation damages, noting that doing so would

> read[] into agreements between sophisticated parties provisions that are not there.
> Perhaps the parties negotiated on the subject but were unable to reach an agreement.  It may simply, although less probably, be that this subject was overlooked.  In either case, the court cannot supply what is absent. . . . Nothing in the Bankruptcy Code requires this court to provide the 2009 Noteholders with *more* than the Original Indenture provides.  Put yet another way, they have no dashed expectations for which compensation is due.

*Id*. at 485 n.7 (emphasis in original).[18]  In rejecting the noteholders' request for "expectation" claims for a future interest income stream, the court reasoned that

_____

[18]        The court in *Solutia* noted that

> [b]y incorporating a provision for automatic acceleration, the 2009 Noteholders made a decision to give up their future income stream in favor of having an immediate right to collect their entire debt. Because the 2009 Noteholders were automatically accelerated, any payment at this time would not be a prepayment. Prepayment can only occur prior to the maturity date . . . Here payment will be a post-maturity date repayment. This court need not concern itself with the enforceability of prepayment premiums in bankruptcy.

*Id.* at 488.[19]

In an unpublished decision involving almost identical provisions and circumstances, the court in *U.S. Airways, Group, Inc., et al.* held that a prepetition indenture did not require payment of a make whole amount. In that case, the debtors requested approval of several sale leaseback transactions with respect to certain aircraft. (*See* Hr'g Tr. at 5:4-6:17; 12:6-13:4; 16:20-17:5, *In re U.S. Airways Group, Inc., et al.*, Case No. 04-13819 (Bankr. E.D. Va. Sept. 19, 2005), attached as Exhibit D to the Debtors' Reply (the "U.S. Airways Transcript")). In connection with the transactions, those debtors sought to pay off the outstanding debt from the prepetition indentures. (*Id.*) They argued that, under the prepetition indentures, the bankruptcy filing was an event of default that gave rise to an acceleration that allowed the debtors to pay off the debt without a make whole amount. (*See* U.S. Airways Tr. 8:1-4).

Like this case, the prepetition indenture in *U.S. Airways* contained provisions that classified a bankruptcy filing as an event of default. (*See* U.S. Airways Tr. 46:14-16). It also provided that upon the commencement of a voluntary bankruptcy, the unpaid principal and interest would be due immediately without demand, but it was not followed by language stating

---

> [i]t is possible to provide contractually for post-acceleration 'yield maintenance' of some sort. The 2009 Noteholders point to a number of provisions in the 2009 Indenture that they say act to ensure they can collect the Interest Payments until the Stated Maturity Date despite acceleration. None of these clauses have the explicitness that would be expected in a typical post-acceleration yield-maintenance clause.

*Id.* at 488.

[19]  While *Calpine* and *Solutia* involve no-call provisions as opposed to make whole premiums, each case nonetheless stands for the proposition that in the event of an acceleration of debt, the contractual language should provide explicitly for a premium if one is to be recoverable. The Indentures here did not.

that the make whole amount was not payable.  (*See* U.S. Airways Tr. 65:3-14).  But the

indentures included a separate section providing a waterfall for payments after an event of

default, which explicitly stated that in the event of an acceleration of the notes, no make whole

premium was due.  (*See* U.S. Airways Tr. 64:10-14).  Another section similarly provided that if

an event of default occurred then the indenture trustee may declare the notes due and payable,

whereupon the unpaid principal interest, without the make whole amount would be due.  (*See*

U.S. Airways Tr. 64:15-65:3).  Two parties, including U.S. Bank as Indenture Trustee, objected

to the transactions on the basis that the debtors were exercising a voluntary repayment and that a

make whole amount should be paid.  The objection relied upon a provision that a make whole

amount was due if the notes were paid prior to maturity.  (*See* U.S. Airways Tr. 60:1-7).

Reading the agreement as a whole, the court in *U.S. Airways* overruled the objection and found

that "the omission of the parenthetical phrase, without make whole amount, from the proviso"

relating to automatic acceleration did not introduce the requirement of paying a make whole

amount.  (*See* U.S. Airways Tr. 66:16-21).[20]

    Urging a different result, U.S. Bank cites to several phrases from the Indentures to

support its argument that voluntary redemption controls in these circumstances.  U.S. Bank relies

upon the definition of Make-Whole Amount, which states that "Make-Whole Amount means,

with respect to any Equipment Note, the amount (as determined by an independent investment

banker selected by the Company (and, *following the occurrence and during the continuance of*

---

[20]      It is irrelevant that the proposed payment in *U.S. Airways'* was to occur after confirmation of the plan.  The
plan that provided for reinstatement of similar debt had been confirmed, but had yet to go effective, and the court
stated that "as long as the asset sale is approved prior to the reinstatement of the equipment notes, which is
essentially default treatment under the Plan, as part of the confirmed Plan, the provisions of the indenture, which are
applicable in the case of acceleration rather than voluntary payment, control."  (*See* U.S. Airways Tr. 69:8-17).  It is
similarly irrelevant that the majority noteholders in *U.S. Airways* supported refinancing.  Despite that support for the
refinancing, U.S. Bank pursued its objection as trustee and the court ruled upon the merits of the argument.  (*See*
U.S. Airways Tr. 25:13-26, 31:11-16).

*an Event of Default*, reasonably acceptable to the Loan Trustee) . . ." (2011-2 EETC Indenture §

Annex A p. A-13; *see also* 2009-1 EETC Indenture Annex A p. A-12) (emphasis added). U.S.

Bank argues that this language contemplates a Make-Whole Amount being paid during a default.

But that does not mean that such a payment is due for the specific default at issue here. The

language of Section 4.02(a)(i) specifically carves out the payment of a Make-Whole Amount in

the event of acceleration, and thus would prevail over any general reference to an event of

default contained in the definition of a Make-Whole Amount. *See Bowmer v. Bowmer*, 50

N.Y.2d 288, 294 (1980) (a basic principal on contract interpretation under New York law is that

specific terms in a contract will override the general); *John Hancock Mut. Life Ins. Co. v.

Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes

that definitive, particularized contract language takes precedence over expressions of intent that

are general, summary, or preliminary."); *see also Restatement (Second) of Contracts* § 203

(1981) ("In the interpretation of a promise or agreement or a term thereof, . . . specific terms and

exact terms are given greater weight than general language."). Indeed, when general and specific

provisions of a contract are inconsistent, "the specific provision controls." *Muzak Corp. v. Hotel

Taft Corp.*, 1 N.Y.2d 42, 46 (1956); *see also Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3 (2009)

(stating that if contractual provisions are irreconcilable, "the more specific clause controls the

more general") (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of

Contracts § 32:15 (4th ed. 1999 & Supp. 2010)); 11 Williston & Lord, *supra*, § 32.10 ("Where

general and specific clauses conflict, the specific clause governs the meaning of the contract. . .

."); 5 Margaret N. Kniffin, Corbin on Contracts § 24.23 (Rev. Ed. 1998) ("If the apparent

inconsistency is between a clause that is general and broadly inclusive in nature and one that is

more limited and specific in its coverage, the more specific term should usually be held to

prevail over the more general term."); *see also In re Premier Entm't*, 445 B.R. at 631-32 ("The

Claimants chose to forego any prepayment premium in favor of an immediate right to collect

their entire debt after a bankruptcy event of default.  The parties to the Indenture are

sophisticated investors who bargained for the risks and benefits of this undertaking of

considerable size.")[21]

U.S. Bank also notes that under the Indentures, the Prepetition Notes "may be redeemed

by the Company *at any time . . .*"  (2011-2 EETC Indenture § 2.11(a); *see also* 2009-1 EETC

Indenture § 2.11(a); 2009-2 Secured Notes Indenture § 2.20) (emphasis added).  U.S. Bank

interprets this to mean that a voluntary redemption may take place at any time, either prior or

subsequent to bankruptcy.  But again, this argument accepts U.S. Bank's viewpoint that the

bankruptcy induced acceleration here does not define the parties' rights.  Even if the voluntary

redemption provision were somehow controlling here, however, it still does not mandate

payment of a Make-Whole Amount.  Section 2.11 specifically states that in the event of a

voluntary redemption, American must pay unpaid principal and accrued and unpaid interest

thereon, "plus Make-Whole Amount, *if any. . . .*"  (2011-2 EETC Indenture § 2.11(a); *see also*

2009-1 EETC Indenture § 2.11(a); 2009-2 Secured Notes Indenture § 2.20) (emphasis added).

U.S. Bank contends that Section 2.11 "clearly" mandates a Make-Whole Payment, as the "if

any" language relates only to the payment amount—that is, the design of the Make-Whole

---

[21]    As a general matter, the Make-Whole Amount definition addresses the calculation of the Make-Whole
Amount and the selection of an investment advisor to do so.  The language relied upon by U.S. Bank is, in fact,
contained within two parenthetical clauses which appear to modify the word "amount" in the definition.  Thus, the
definition would seem to be an odd place in which to look to determine the Events of Default under the Indentures
or the resulting remedies, subjects which are both specifically addressed elsewhere in the Indentures.  (*See* Sections
4.01 and 4.02).  Looking at the specific definitional language, moreover, U.S. Bank's interpretation overlooks the
fact that the Indentures provide that there are instances where an Event of Default does not result in a remedy that
includes payment of a Make-Whole.  (*See* Section 4.02(a)(i); *cf.*, Hr'g Tr., 54:24-55:18, Nov. 8, 2012).

formula, which moves with interest rates and could, under some circumstances, provide a Make-

Whole Amount of zero.  But U.S. Bank points to nothing in Section 2.11, or anywhere else in the

Indentures, that corroborates this strained interpretation of the plain language.  The Court instead

reads "if any" to mean that payment of the Make-Whole Amount is not automatic and there are

some circumstances under which a Make-Whole Amount will not be payable.[22]  Such a reading

harmonizes the language in Section 2.11 with that in Section 4.02, which specifically calls for no

Make-Whole Amount after a bankruptcy default and resulting acceleration.  New York law

provides that a court should construe a contract in a way that reasonably harmonizes its

provisions and avoids inconsistencies.  *See James v. Jamie Towers Housing Co.*, 743 N.Y.S.2d

85, 87 (App. Div. 2002); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (App. Div.

1989).

U.S. Bank argues that premiums such as make whole amounts have been recognized as

valid under New York law.  U.S. Bank also cites cases recognizing the importance and business

purpose of make whole amounts and that such amounts are generally allowed in a bankruptcy

context.  But U.S. Bank's citations miss the point.  There is no dispute that make whole amounts

are permissible.  The entitlement to such payments, however, is a matter of contract, not policy.

The cases cited by U.S. Bank are not enlightening, as none contain contractual language

---

[22]     Several other sections of the Indentures relied upon by U.S. Bank contain the same "if any" caveat.  For instance, the Indentures provide for the termination of the noteholders' interest in their collateral:

> when and if the principal amount of, Make-Whole Amount, if any, and interest (including, to the extent permitted by law, post-petition interest and interest on any overdue amounts) on and all other amounts due under all Equipment Notes held by such Noteholder and all other sums then due and payable to such Noteholder or Indenture Indemnitee, as the case may be, hereunder (including, without limitation, under Section 2.14) and under the Participation Agreement by the Company . . . have been paid in full.

(2011-2 EETC Indenture § 2.06; *see also* 2009-1 EETC Indenture § 2.06; 2009-2 Secured Notes Indenture § 2.27).  Additionally, the Indentures may only be terminated "upon (or at any time after) payment in full of the principal amount of, Make-Whole Amount, if any, and interest on and all other amounts due under all Equipment Notes . . . ."  (2011-2 EETC Indenture § 10.01; *see also* 2009-1 EETC Indenture § 10.01; 2009-2).

specifically excluding the payment of a make whole amount where there has been a bankruptcy

default and resulting acceleration.[23]    If the parties wished for the Make-Whole Amount to be due

in these circumstances, they could have bargained for such a provision.  Instead, the parties

bargained for the exact opposite result, with the Indentures stating clearly, explicitly and

unambiguously that the Make-Whole Amount is not due in the event of payment following

acceleration.

U.S. Bank cites to several cases in which courts have held that a prepayment penalty or

redemption premium are due, notwithstanding the acceleration of a debt.  *See Sharon Steel Corp.*

*v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982); *Imperial Coronado*

*Partners, Ltd. v. Home Fed. Sav. and Loan Ass'n. (In re Imperial Coronado Partners, Ltd.)*, 96

B.R. 997, 1000 (B.A.P. 9th Cir. 1989); *In re Skyler Ridge*, 80 B.R. 500, 507-08 (Bankr. C.D. Cal.

1987).  These cases are, however, distinguishable.  As noted in *Sharon Steel*, repayment with

respect to redemption or prepayment is not necessarily mutually exclusive of payments due by

virtue of acceleration.  *See Sharon Steel*, 691 F.2d at 1053.  But the language contained in

Section 4.02(a)(i) makes such payments mutually exclusive.  In the case of a voluntary

redemption, a Make-Whole Amount is due, but if payment is made due to acceleration, it is not.

*Sharon Steel* is also easily distinguishable because the Second Circuit specifically held there that

---

[23]    *See generally U.S. Bank Objections (citing United Merchs. and Mfr., Inc. v. Equitable Life Assurance Soc'y of the United States (In re United Merchs.& Mfr., Inc.)*, 674 F.2d 134, 140-141 (2d Cir. 1982) (agreement provided that if the lender accelerated, a prepayment charge would be payable as if the debtor were prepaying the note at the time); *AE Hotel Venture v. GMAC Commercial Mortg. Corp.*, 2006 U.S. Dist. Lexis 2040, at *7 (N.D. Ill. Jan. 20, 2006) (agreement provided that if, following an event of default, payment in amount sufficient to satisfy debt prior to foreclosure, tender would be deemed a voluntary prepayment and would be subject to prepayment consideration if at the time of such tender prepayment of the note was not permitted); *Teachers Ins. & Annuity Ass'n v. Butler*, 626 F. Supp. 1229, 1230 (S.D.N.Y. 1986) (agreement provided that if lender accelerated following default, any payment of the entire indebtedness made prior to foreclosure would be deemed voluntary prepayment resulting in inclusion of a premium); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 126 (Bankr. E.D.N.Y. 2002) (note required payment of yield maintenance premium in connection with any prepayment of loan, whether payment is voluntary or involuntary (in connection with holder's acceleration of unpaid principal balance); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 397 (Bankr. S.D.N.Y. 2007) (agreement simply provided for prepayment penalty if the debtor paid down any advances prior to maturity); *In re Anchor Resolution Corp.*, 221 B.R. 330, 333 (Bankr. D. Del. 1998) (agreement provided for make whole amount in the case of a prepayment of principal or an event of default)).

"[t]he acceleration provisions of the indentures [were] explicitly permissive and not exclusive of other remedies." *Sharon Steel*, 691 F.2d at 1053. *Skyler Ridge* is also distinct in that it is framed as a debate about the validity of a liquidated damages clause as a penalty, an issue not before the Court. As noted in the *U.S. Airways* decision, *Imperial Coronado* related to an apartment complex in a liquidation plan, whereas this case is not a single asset debtor involved in a plan of liquidation but rather "a complicated estate involving an operating airline in which the reorganization involves a large number of interrelated transactions and trade offs. . . . [These transactions have] to be viewed not in isolation, but as part of the larger effort to position the reorganized debtor so that it will be able, upon emergence, to compete in what everyone recognizes to be economically uncertain territory. Maximizing the debtors' cash is part and parcel of the debtors' emergence strategy." (U.S. Airways Tr. 68:20-69:7).[24]

    3. <u>Section 1110</u>

U.S. Bank argues that the Debtors' attempt to obtain new financing to replace the prepetition financing, without payment of the Make Whole, is inconsistent with Debtors' prior exercise of rights under Section 1110 of the Bankruptcy Code in this case. The Court does not agree.

Section 1110 provides certain special rights to parties involved in aircraft financing.[25] More specifically, the provision allows a party with a security interest in aircraft and related

---

[24]    In the same vein, none of these cases contained language similar to the "if any" caveat contained in Section 2.11.

[25]    Section 1110 provides, in part:

    (a) (1) Except as provided in paragraph (2) and subject to subsection (b), the right of a secured party with a security interest in equipment described in paragraph (3), or of a lessor or conditional vendor of such equipment, to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this

equipment to take possession of its collateral pursuant to the terms of the contract,

notwithstanding the automatic stay normally imposed by Section 362 upon the filing of the

bankruptcy, unless the debtor meets certain conditions.  These conditions include that, within the

first 60 days of the case, the debtor[26] must agree to perform its contractual obligations as they

---

title or by any power of the court.

(2) The right to take possession and to enforce the other rights and remedies described in paragraph (1) shall be subject to section 362 if--

(A) before the date that is 60 days after the date of the order for relief under this chapter, the trustee, subject to the approval of the court, agrees to perform all obligations of the debtor under such security agreement, lease, or conditional sale contract; and

(B) any default, other than a default of a kind specified in section 365(b)(2), under such security agreement, lease, or conditional sale contract--

(i) that occurs before the date of the order is cured before the expiration of such 60-day period;

(ii) that occurs after the date of the order and before the expiration of such 60-day period is cured before the later of--

(I) the date that is 30 days after the date of the default; or

(II) the expiration of such 60-day period; and

(iii) that occurs on or after the expiration of such 60-day period is cured in compliance with the terms of such security agreement, lease, or conditional sale contract, if a cure is permitted under that agreement, lease, or contract.

(3) The equipment described in this paragraph--

(A) is--

(i) an aircraft, aircraft engine, propeller, appliance, or spare part (as defined in section 40102 of title 49) that is subject to a security interest granted by, leased to, or conditionally sold to a debtor that, at the time such transaction is entered into, holds an air carrier operating certificate issued pursuant to chapter 447 of title 49 for aircraft capable of carrying 10 or more individuals or 6,000 pounds or more of cargo; or

(ii) a vessel documented under chapter 121 of title 46 that is subject to a security interest granted by, leased to, or conditionally sold to a debtor that is a water carrier that, at the time such transaction is entered into, holds a certificate of public convenience and necessity or permit issued by the Department of Transportation; and

(B) includes all records and documents relating to such equipment that are required, under the terms of the security agreement, lease, or conditional sale contract, to be surrendered or returned by the debtor in connection with the surrender or return of such equipment.

(4) Paragraph (1) applies to a secured party, lessor, or conditional vendor acting in its own behalf or acting as trustee or otherwise in behalf of another party.

11 U.S.C. § 1110.

[26]     The language of Section 1110 actually refers to the actions of the trustee, not the debtor.  *See, e.g.,* Section 1110 (b)(2)(A).  But the bankruptcy trustee in this case, and most cases under Chapter 11, is the debtor in possession.  *See In re Harp*, 166 B.R. 740, 746 (Bankr. N.D. Ala. 1993) ("Chapter 11 debtors-in-possession . . . have fiduciary responsibilities to unsecured creditors and other parties in interest requiring them to act in the capacity of a bankruptcy trustee.").

become due and that the debtor must also cure certain—but not all—contractual defaults.[27]  In

practice, Section 1110 gives the debtor the benefit of the automatic stay for the first 60 days

following the filing of a bankruptcy petition, at which point the debtor generally must either elect

to cure all non-bankruptcy defaults and perform under the contract or surrender the aircraft.

Pursuant to Section 1110(a)(2), the Debtors elected to perform the terms of these three

Indentures and cure any non-bankruptcy defaults identified in Section 1110, and thus were

afforded the stay protections of Section 362 of the Code for the aircraft in question.  But that

election does not require the payment of the Make-Whole Amount.  First and foremost, Section

1110 does not require a debtor to cure a bankruptcy default.  *See* 11 U.S.C. § 1110(a)(2)(B).

And it is a bankruptcy default here under Section 4.01(g) of the Indentures that triggers the

acceleration under Section 4.02(a)(i) and the language that provides for no payment of a Make-

Whole Amount.  Thus, Section 1110 does nothing to interfere with the operation of these

controlling provisions of the Indentures.

Moreover, Section 1110 simply sets the terms under which the automatic stay will remain

in effect with respect to aircraft lessors and financers; a Section 1110 election does not constitute

a permanent commitment on the part of a debtor to permanently bind itself to the terms of a

contract.  Indeed, numerous courts have recognized the limited nature of Section 1110.  *See W.*

*Pac. Airlines v. GATX Capital (In re W. Pac. Airlines)*, 219 B.R. 305, 309-10 (D. Colo. 1998)

---

[27]     Under section 1110(a)(2)(B), a debtor is not required to cure those defaults that are "of a kind specified in section 365(b)(2)."  11 U.S.C. § 1110(a)(2)(B).  These include

a default that is a breach of a provision relating to--
(A) the insolvency or financial condition of the debtor at any time before the closing of the case;
(B) the commencement of a case under this title;
(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or
(D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2).

("Both sides misconstrue the purpose and effect of § 1110 by failing to consider it in the context

of the Bankruptcy Code as a whole and by seeking to extend its effect beyond its terms.  Section

1110 was enacted to protect a specific and narrowly defined class of financiers and should be

narrowly construed. . . .  It serves a limited function, providing lessors of aircraft equipment (and

other lessors/financiers falling within its scope) with relief from the automatic stay unless the

trustee or debtor-in-possession reaffirms its lease obligations and cures its defaults within a

statutorily prescribed period.  Once the debtor does so, the section has served its purpose.")

(internal citations omitted); *In re UAL Corp.*, 299 B.R. 509, 521 (Bankr. N.D. Ill. 2003)

("Without the cure of the prepetition defaults, the only benefit of the 1110(a) election--

continuation of the automatic stay--vanished with the end of the 60th day of bankruptcy, just as it

would have without the 1110(a) election."); *see also* 124 Cong. Rec. H11102-03 (daily ed. Sept.

28, 1978) ("It should additionally be noted that under section 1110(a) the trustee or debtor in

possession is not required to assume the executory contract or unexpired lease under section

1110; rather, if the trustee or debtor in possession complies with the requirement of section

1110(a), the trustee or debtor in possession is entitled to retain the aircraft or vessels subject to

the normal requirements of section 365.").

  Indeed, Section 1110 does not prevent a debtor from subsequently rejecting a contract.

*See Interface Grp.-Nev., Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145

F.3d 124, 137 (3d Cir. 1998) ("A § 1110 agreement . . . operates neither as an assumption nor as

a rejection *of the entire lease*, but rather, obligates the debtor to perform the lease obligations *as*

*they come due*, in return for the protection of the automatic stay.  After the § 1110 agreement is

made, the debtor remains free to make a formal assumption or rejection of the lease and, until

that time or such time as the § 1110 agreement is breached or terminated, the automatic stay of §

362 remains in effect.") (emphasis added); *see also Braniff, Inc. v. GPA Grp. PLC (In re Braniff, Inc.)*, 118 B.R. 819, 844 (Bankr. M.D. Fla. 1990). A Section 1110 election also does not appear to constitute a reinstatement of debt. *See, e.g., In re Mesa Air Grp., Inc.*, 2011 WL 182450, at *19, 33, 35 (Bankr. S.D.N.Y. Jan. 20, 2011) (reinstating aircraft debt pursuant to Section 11124, that were previously the subject of a Section 1110 election).

Consistent with the limited scope of Section 1110, the Section 1110 Order in the Debtors' cases as to these three Indentures specifically provided that the Section 1110 agreements and elections made by the Debtors did not constitute assumptions of the various aircraft agreements under Section 365 of the Bankruptcy Code. Nor did the Section 1110 agreements and notices restrict the Debtors' ability to later restructure, reject or abandon the aircraft agreements for which the Debtors have made the Section 1110 election.[28]

---

[28]    The Section 1110 Order states:

> The 1110 Agreements and the 1110 Election Notices shall not constitute assumptions of any Aircraft Agreement under section 365 of the Bankruptcy Code (to the extent that such section is applicable) and shall in no way restrict the Debtors' ability to (i) later restructure such Aircraft Agreement with the consent of the appropriate Aircraft Parties or holders of securities relating to the financing of the Aircraft Equipment, if applicable, or (ii) reject or abandon the Aircraft Equipment relating to such Aircraft Agreement; provided, however, that nothing contained in this paragraph shall abrogate or otherwise affect the Debtors' obligations, if any, or any Aircraft Party's rights, if any, under section 1110(c) of the Bankruptcy Code. By making an 1110 Agreement or filing an 1110 Election Notice, the Debtors do not waive or impair their right to argue that any Aircraft Equipment subject to an 1110 Agreement or an 1110 Election Notice is not entitled to the protection of section 1110 of the Bankruptcy Code.

(Section 1110 Order, ¶ 10).

The Section 1110 Order also preserves the rights of aircraft financing parties, stating that:

> Notwithstanding anything else herein, except to the extent specifically identified in any 1110 Election Notice, nothing herein shall affect any Leased Aircraft Notice Party's or Owned Aircraft Notice Party's rights (or any defenses thereto of the Debtors or any other party-in-interest) with respect to (a) as applicable, any payment of obligations relating to non-regularly scheduled payment obligations arising under any of the Aircraft Agreements or relating to any Aircraft Equipment (including, without limitation, indemnifications, expense reimbursements and non-regularly scheduled rent); (b) any obligations that arise, accrue or otherwise become due only after notice, demand or information is provided to the Debtors or other person or entity; and (c) any non-monetary defaults or obligations arising under any of the Aircraft Agreements. In addition, notwithstanding section 362(a) of the Bankruptcy Code, to the extent any obligations arising under

U.S. Bank argues that a Section 1110(a) agreement cannot be used offensively here against the noteholders, because doing so would be inconsistent with the purpose of Section 1110.  The Court recognizes the extraordinary protection that Congress extended to aircraft financers through Section 1110, a point emphasized by U.S Bank.  *See Cal. Chieftan v. Air Vt., Inc. (In re Air Vt.)*, 761 F.2d 130, 132 (2d Cir. 1985) (observing that under Section 1110 Congress "intend[ed] to extend extraordinary protection to financiers of aircraft in order to encourage investment in new equipment for air carriers, especially small ones . . . Congress intended to encourage this investment, by providing that the power of creditors to repossess aircraft from a defaulting debtor not be restricted in any way by the usual protections afforded debtors-in-possession or trustees by the Bankruptcy Code.") (internal citations omitted).  In contrast to other types of agreements, Section 1110 sets a higher hurdle for those debtors wanting to take advantage of the automatic stay in the context of an aircraft financing by automatically requiring the debtors, among other things, to cure any defaults in contract payment.  U.S. Bank continues to benefit from this requirement, as the debtor has yet to miss a regularly scheduled payment of principal or interest.  U.S. Bank has continued to accept these payments, which it would not otherwise receive absent Congress's enactment of Section 1110.[29]

U.S. Bank complains that the Debtors continue to perform under the Indentures as if a bankruptcy event of default had not occurred, but now seek to use Section 1110 offensively by arguing that such a default should allow them to avoid their contractual obligation to pay the

---

any of the Aircraft Agreements require that notice, demand or information be provided to the Debtors, the Leased Aircraft Notice Parties or Owned Aircraft Notice Parties may give such notice, demand or information to the Debtors of any such obligations in accordance with the terms of the Aircraft Agreements.

(Section 1110 Order, ¶ 11).

[29]     Without the benefit of Section 1110, U.S. Bank would have to prove to a court that it was entitled to some form of adequate protection to compensate for diminution in the value of its collateral postpetition or a *bona fide* threat of such a decline.  *See In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 751 (Bankr. S.D.N.Y. 2004).

Make-Whole Amount.[30]  U.S. Bank contends that if the Notes truly had been accelerated, then

the Debtors should have paid the principal amount of the notes together with accrued interest

when they made the Section 1110 agreement.  But the source of U.S. Bank's unhappiness then is

with the statute, which specifically provides that a bankruptcy default need not be cured, even

where a debtor takes the steps needed to have its aircraft covered by the automatic stay.  It is the

statute that separates the stay question from any bankruptcy default, which here is what

automatically accelerates the payment of principal and interest.  As acceleration is the automatic

remedy for a bankruptcy default under the Indentures, therefore, it is an obligation triggered by

that default and thus need not be cured pursuant to Section 1110(a)(2)(B).  Of course, the

automatic stay restricts all creditors, aircraft financers or otherwise, from collecting a debt,

accelerated or otherwise.  So while a default existed that would normally obligate the Debtors to

pay the accelerated amount of principal and interest, the bankruptcy protects the Debtors from

having to pay that obligation, and there is no need to do so to keep the stay in place under

Section 1110 of the Bankruptcy Code.[31]

        U.S. Bank believes that allowing the Debtors to avoid the Make-Whole Amount after

entering into the Section 1110(a) agreement would permit debtors going forward to use Section

1110 as a weapon to hold their aircraft lenders at bay while they wait for market conditions to

---

[30]       Incidentally, U.S. Bank appears to have taken a similar approach.  The Shipman & Goodwin LLP
Information Request re: American Airlines 2009-2 Secured Notes, dated July 27, 2012 (Debtors' Reply, Ex. F) cites
to Section 10.02(f) of the 2009-2 Indenture, which allows the Trustee to request certain aircraft-related information
after the occurrence of a bankruptcy event of default and while any such event of default shall be continuing.  The
same letter also acknowledges the Debtors' election under Section 1110 and discusses "American's intention to
continue to perform all of its obligations under the Indenture and Aircraft Security Agreement including, without
limitation, remitting the scheduled principal and interest payment due on August 1, 2012 in the amounts required
pursuant to the indenture and Aircraft Security Agreement."  And notwithstanding these Section 1110 payments,
U.S. Bank's proofs of claim reflect acceleration of the debt.

[31]       Thus the Court rejects U.S. Bank's argument that the Debtors' position reflects an absurd construction of
Section 1110.  *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008), ("Where . . .
examination of [a] statute as a whole demonstrates that a party's interpretation would lead to 'absurd or futile results
. . . plainly at variance with the policy of the legislation as a whole,' that interpretation should be rejected."  (internal
citations omitted)).

improve and then refinance with a new lender. This, however, is not the case. U.S. Bank's

position assumes that its interpretation of the Indentures is correct, a view the Court rejects. The

Court's decision in this matter is driven by the specific contractual language of the Indentures.

Indeed, Section 1110 explicitly respects contractual boundaries, stating that a secured party,

lessor or conditional vendor may "take possession of such equipment *in compliance with a*

*security agreement, lease, or conditional sale contract*" and may "enforce any of its other rights

or remedies, *under such security agreement, lease or conditional sale contract*, to sell, lease, or

otherwise retain or dispose of such equipment." 11 U.S.C. § 1110(a)(1) (emphasis added). A

debtor must agree to "perform all obligations of the debtor *under such security agreement, lease,*

*or conditional sale contract*" and "a default . . . *under such security agreement, lease, or*

*conditional sale contract*" that takes place after 60 days must be "cured *in compliance with the*

*terms of such security agreement, lease, or conditional sale contract*, if a cure is permitted under

that agreement, lease, or contract." 11 U.S.C. §1110(a)(2) (emphasis added). Under the

language of the Indentures then, the Noteholders here are entitled to receive full repayment of

principal and accrued interest without a Make-Whole Amount, which is exactly what they

bargained for in these circumstances. The Debtors are therefore within the limits circumscribed

by their Section 1110(A) election, which simply requires them to comply with the terms of the

Indentures. Each contract is different, of course, and parties are free to draft their contracts as

they wish.[32]

---

[32]     U.S. Bank has argued that discovery is necessary in this matter. (*See* Secured Notes Objection ¶ 55
(reserving right to seek additional discovery); Secured Notes Sur-Reply ¶ 4). When asked at the hearing to
elaborate, U.S. Bank stated that discovery was needed on the Debtors' intent and decision-making process when
making their elections under Section 1110. (Hr'g Tr. 74:14-15, Nov. 8, 2012). Presumably, U.S. Bank contends
that the parties' intentions in entering into Section 1110 Agreements would somehow inform the Court as to the true
meaning of the provisions in the Indentures. But discovery is only appropriate if there is a material issue of fact in
dispute. The Court concludes that there is no material issue of fact in dispute that would preclude a ruling on the
merits of this dispute. (Hr'g Tr. 75:5-20, Nov. 8, 2012 (at the hearing on this Motion, the Court explained its
intention to determine whether this matter could be decided based upon the record before it, and that it would

## CONCLUSION

For the reasons set forth above, the Motion is granted and the motions of U.S. Bank to lift

the automatic stay are denied.  The Debtors are directed to settle an order on three days' notice.


Dated: New York, New York
       January 17, 2013


                                    /s/ Sean H. Lane
                                    UNITED STATES BANKRUPTCY JUDGE

---

reserve the question of whether discovery was appropriate)).  Accordingly, U.S. Bank's request for discovery is
denied.  *See* Bankruptcy Rule 7056 (incorporating, among other things, Rule 56(d) of the Federal Rules of Civil
Procedure, which provides that a court may defer decision on a motion for summary judgment where an opposing
party can show that it cannot present facts essential to opposing the motion).